Dtjrfee, Senior Judge,
delivered the opinion of the court :*
Plaintiff, upon the expiration of his term of Army enlistment, was honorably discharged as a Sergeant on December 10,1958. He was at that time determined to be physically fit for duty. In this suit he contends that on such date he was, in fact, unfit for duty by reason of permanent disabilities and therefore eligible for disability retirement pay. He alleges that the subsequent denials by the Army Board for Correction of Military Records (ABCMR) of his applications that *68 bis records be corrected to show retirement as of such date by reason of physical disability were arbitrary, capricious, and contrary to the applicable law and regulations. Plaintiff consequently claims judgment for disability retirement pay from such discharge date (less disability compensation amounts he has received from the Veterans Administration since his discharge).
Plaintiff served a total of seven years, ten months and IT days on active duty in the Army. He was found physically fit for induction when examined on October 11, 1950, and a second physical examination given plaintiff on December 5, 1952, found him qualified for separation and reenlistment. He served in various capacities during his service period, including that of a motor sergeant and a duty foreman. All character and efficiency ratings given to plaintiff were “excellent.”
In summary, plaintiff’s Army medical record up to the time of his discharge establishes that on August 31,1955, at Fort Meade, Maryland, he suffered a “cerebral vascular accident” (in lay language, a stroke), reported on September 7, 1955, in the attendant physician’s “Narrative Summary,” in pertinent part, as follows:
* * * On neurological examination he has a right facial paralysis and a left arm and left leg nearly total paralysis. There is a substantial loss of sensation over the entire left side and the right face. * * *
and that
In view of the sudden onset and the progressive nature of this trouble, it would seem that this is a progressive lesion in the right hemisphere. We feel that it is the interest of this patient to transfer him to Neurological Service.
Upon transfer to Walter Eeed Army Hospital and a neurological treatment center, after one month’s treatment and observation, gradual improvement of plaintiff’s condition was noted. Plaintiff desired to return to duty and, after 30 days’ convalescent leave beginning on October 6, 1955, it was recommended by a Staff Conference that he be returned to duty. On November 14,1955, his condition was again diag *69 nosed as “Thrombosis of pontine arterial branch due to unknown cause,” incurred in the line of duty, and plaintiff was discharged to duty on that date with a physical profile of unfit for “prolonged marching, standing, exercising, etc.”
Within two months, on January 17, 1956, plaintiff was admitted to the U.S. Army Hospital at Camp Gorden, Georgia, complaining of severe, steady, constant, right occipital headaches which he had developed five days earlier. Upon recommendation he was transferred to a neurological treatment center at Brooke Army Hospital, where he was hospitalized from March 2,1956, to August 9,1956. When plaintiff entered Brooke Army Hospital, physical examination indicated that he had a marked weakness of the left leg and left arm, a markedly diminished left ankle jerk and sluggish left abdominal reflexes. His motor system was considered normal on the right but greatly diminished throughout on the left. He showed some difficulty in walking a straight line with his gait favoring the left leg. His sensory system was decreased on the left from the neck down. There was a mild weakness of the right facial nerve, a diminished sensation of the right face and diminished hearing on the right. His coordination was fair on the right and' was poor on the left. An electroencephalogram (EEG) given on March 7, 1956, was reported as being abnormal in the right temporal area, and indicative of focal brain damage. Although improvement was noted during plaintiff’s stay in the hospital, his condition was still diagnosed at the conclusion of this hospitalization as “Thrombosis, n.e.c. (not elsewhere classified), branch of pontine artery, due to undetermined cause.” On August 17, 1956, plaintiff’s Army unit was notified by the Brooke Army Medical Center that he had suffered a cerebral vascular accident which was deemed to be permanent, and that he “should not perform duty necessitating flying or working in high altitudes” because of possibilities of thrombosis and paralysis.
From tins time, August 9, 1956, until May 1958, plaintiff was examined and treated at least seven times for pain in the left pectoral muscle, in the right leg and shin, constant pain *70 in the right tempero-occipital area with, pain under the right eye, and right temporal facial headaches (diagnosis: “migraine, cause unknown”).
In April 1958, eight months prior to his discharge, plaintiff was examined in connection with a request for evaluation of his prior cerebral vascular accident, and the left side hemi-paresis and the right facial paralysis that followed it. The examining physician was Captain Lester B. Nay, Jr. The consultation report rendered by Captain Nay stated his “Impression” as “Eesiduals of vascular lesion, possibly involving the right tegmental region of the pons.”
A physical examination for separation of plaintiff was conducted by Captain Echols A. Hansbarger on December 8, 1958. He noted plaintiff’s medical history, and stated that plaintiff needed hospitalization and clearance for discharge from the medical, orthopedic, genito-urinary, and neuro-psychiatric departments.
From December 5 to December 9,1958, plaintiff was hospitalized for such examination and clearance for discharge. The examining physician, Captain Abner I. Bagins, noted that the patient had retained a slight weakness of the right facial muscles, 'and complained of fatigue on the left side of the body with overexertion, and swelling of the left knee following prolonged standing. The diagnosis was: “1) — 3682— Neuropathy, n.e.c., involving in the right 7th nerve, with mild left-sided hemiparesis, secondary to thrombosis of the right pontine artery in 1955. LOD: Yes. (nondisabling).”
On December 9, 1958, Captain Hansbarger completed his report of plaintiff’s medical examination. The Clinical Evaluation listed plaintiff’s “abnormalities,” including, with regard to his face, “Bight facial hemiparesis,” and with regard to “Neurologic,” “very mild left Hemiparesis, walks with slight limp. Beflexes equal and active. Free range of motion to all joints and extremities.” Captain Hansbarger’s “Summary of Defects and Diagnosis” stated:
Hemiparesis, left, very mild, not disabling, LOD Yes. Migraine, cause undetermined, mild, LOD Yes. History of cerebral vascular accident in 1955. Etiology undetermined (sickle cell preparations negative), LOD Yes.
*71 There is no record of an electroencephalogram (EEG) having been performed in connection with, or during, plaintiff’s examination for separation.
Plaintiff’s medical examiners considered him physically qualified to be retained on active duty. On December 9,1958, medical clearance was given for plaintiff’s separation by the U.S. Army Hospital at Fort Belvoir, and he was honorably discharged the following day.
The professional qualifications of the medical personnel who examined plaintiff for separation, and who ultimately made the determination of fitness, were as follows:
Captain Hansbarger, who acquired his degree in medicine only two years before his final report, was eventually certified, in 1963, as a specialist in the field of pathology.
Captain Ragins was licensed in 1955, and commenced his medical service in the Army the year before his examination of plaintiff. He was later certified, in 1963, in internal medicine.
Captain Nay, who conducted the examination of plaintiff eight months prior to his discharge, acquired his medical degree in 1955, and was serving as a neurology resident, in a training status.
The history of plaintiff’s neurological conditions, and the frequent and consistent references in his medical reports to the need for neurological or neuropsychiatric treatment, study and evaluation of the conceded residuals from his original serious brain injury and paralysis of the face and left side in 1955, certainly required that he receive expert final evaluation before discharge by qualified and experienced specialists in the highly technical field of neurology. Equally certain is the fact that neither Captain Hansbarger, Captain Ragins nor Captain Nay possessed these requisite qualifications when they reported plaintiff as physically fit for active duty.
We regard as significant an entry on plaintiff’s Army discharge record, in paragraph 75 of a prescribed medical form, captioned “RECOMMENDATIONS — FURTHER SPECIALIST EXAMINATIONS INDICATED (Specify).” *72 The entry by the Army thereunder was “Continued treatment after discharge.” Neither the Correction Board nor our trial judge considered this entry as having any significance. Upon questioning by the court at oral argument as to the significance or meaning of this notation, counsel were unable to provide any helpful explanation. Defendant submits, however, that continued treatment does not necessarily indicate unfit condition, and that this “rather is a common entry where there is a more or less minor condition, in this case, residuals.”
We can only now conclude that the Army’s recommendation on plaintiff’s discharge record for further specialist examinations was intended to require continued neurological observation and treatment after discharge for the residuals from plaintiff’s stroke. Plaintiff’s medical history subsequent to his discharge, including the long and extensive “continued treatment” conducted by the Veterans Administration for the same residuals found to be 60 percent disabling, hardly indicates a “minor condition.” In view of this fact, we consider that this recommendation by the Army for “continued treatment after discharge” is highly relevant, when considered with plaintiff’s medical history prior to discharge, in any inquiry as to plaintiff’s fitness on the date of his discharge. In short, this notation should have put the Army Board for the Correction of Military Records on notice of the importance, in this case, of considering the applicant’s medical condition subsequent to his discharge, and the professional evaluation and treatment thereof, in its determination of fitness for duty as of the date of discharge.
In Ward v. United States, 178 Ct. Cl. 210, 216-47 (1967), the court found that a decision by a Naval Correction Board finding that Ward was fit for duty was not supported by substantial evidence. The court there noted the applicable standard of review, as follows:
The court begins its consideration of the legal principles applicable to the facts of this case by reaffirming what it has often stated as to the need of clear and convincing evidence of arbitrary or capricious action, before it will reverse the action of the Secretary or the Board for the Correction of Naval Records which has *73 found a person fit for military service when that person was released to inactive duty. “We cannot substitute our judgment for theirs, as to who is fit to serve in the Army.” Furlong v. United States, 153 Ct. Cl. 557, 563 (1961) and cases cited. It is only where the decision of the board is clearly unsupported by substantial evidence or when there was a noncompliance with applicable laws and regulations, that this court may interfere with the findings of the correction board. Towell v. United States, 150 Ct. Cl. 422 (1960) ; Furlong, supra.
The court is mindful of the emphasis on the above principle, as argued by defendant. However, the court in Ward continued:
This court has not hesitated to scrutinize the action of correction boards, and to enter money judgments for amounts equal to retired pay where it has found the correction board action unsupported by substantial evidence. Smith v. United States, 168 Ct. Cl. 545 (1964). Even where, as in this case, “_[t]he fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.” Williams v. United States, 130 Ct. Cl. 435, 441, 127 F. Supp. 617, 619 (1955), cert. denied 349 U.S. 938. See also Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951).
Even though defendant’s evidence in the instant case, considered of and by itself, might support the administrative decision by the Army to discharge plaintiff ¡as physically fit, we find, as hereinafter discussed, that there is “opposing evidence [principally, plaintiff’s medical record with the VA] so substantial in character” as to detract from the weight of the evidence in support of the Army discharge, and to render it “less than substantial on the record as a whole.” Ward, supra.
Three weeks after plaintiff’s discharge he applied to the Veterans Administration for disability compensation. On February 10, 1959, exactly two months after discharge, he was evaluated by Dr. Charles E. Walton, who was certified in 1948 by the American Board of Psychiatry and Neurology *74 in the field of psychiatry.[1] Dr. Walton analyzed plaintiff’s disabilities and diagnosed his condition as “Thrombosis, cerebral, (Pontine) old, with persistent left hemiplegia. Competent for VA funds.” On March 18,1959, plaintiff was awarded a 60 percent disability rating for “residuals of thrombosis of the pontine artery.” The VA decision stated, in part:
The current examination shows the veteran to limp, sparing the left leg which the neurological examination shows a tendency to drag the left foot in a hemiplegic fashion. * * * There is some ataxia on the left in the finger to finger and heel to knee test; moderate to severe weakness in the left upper and lower extremities, and sensation is diminished on the left half of the body. There is no evidence of psychosis or mental deterioration though the veteran was somewhat slow in thinking and in his movements. * * * The remainder of the examination is essentially negative. The eyes corrected to normal vision.
Service connection is established for the residuals of cerebral vascular accident * * *.
On March 27, 1962, plaintiff was examined by the VA at its facility in Montgomery, Alabama, for an evaluation of his disability. At that time, he was employed at the VA Hospital in Montgomery as a nursing assistant. The examining physician stated that: “Gross examination and observation of this veteran, one cannot see how he can be a nursing assistant at VAH. He is not physically able to do the work anywhere near satisfactory or enough to be worth hiring a man in this situation.” He stated that plaintiff “is chronically ill;” that he “walks with a slight limp of his left leg;” that “there is a loss of ability to wrinkle the forehead on the right side” and that he is “paralyzed partially on the right side of his face;” that he is “not able to draw his legs over to the right,” although there was “no marked flattening * * * of the facial contours” *75 and that “he has a normal appearing face” and that the “only time that would note any lack of ability to move the face would be when he is laughingthat his speech was “a little slow, sluggish and slurred;” that he “elevates the left arm only up to about a 38-40 degree angle, not up to shoulder level;” that he “has good motion of both extremities at the elbows, wrists, and hands, but has no grip with his left hand at all;” that there is a “weakness of his left leg in comparison to the right;” that he is “unable to stand on tiptoe with the left leg;” that “on forward bending the patient touches the floor without bending his knees;” that he “squats down well and rises well, but he is weak and has a little trouble with his equilibrium;” that the “left ankle jerk is sluggish;” and that the “right calf muscle is y2 inch larger than the left,” although “both thigh muscles are equal volume.” The “Impression” at the end of the medical report was, in part:
Stroke, with the following residuals: (1) Paresis of the right face, mild, (2) Paresis of the left arm with loss of strength and grip but no wasting, (3) Paresis of the left leg, mild; able to be ambulatory very well without assistance.
As a result of the examination, it was concluded that no change had occurred in plaintiff’s condition since his previous rating, and on April 11,1962, the YA accordingly confirmed, without change, the March 18, 1959, rating decision of 60 percent disability.
On November 14, 1963, plaintiff, without counsel, filed an application with the Army Board for Correction of Military Secords requesting that his records be corrected to show that he was retired because of physical disability. Plaintiff indicated that he desired to appear before the Board in Washington, D.C., if necessary.
Thereafter, the YA furnished the Correction Board with all plaintiff’s medical records and reports requested. Plaintiff’s application and all of his pertinent records were then referred by the Board to the Surgeon General’s Office (SGO), with a request for review and opinion upon the medical issues, and upon whether plaintiff should appear before a medi *76 cal or Physical Evaluation Board for a determination of the issues involved. There is no record before us of any determination by a medical or Physical Evaluation Board.
On March 20,1964, Lieutenant Colonel Snyder of the Surgeon General’s office furnished the Correction Board with an advisory opinion which, in part, stated:
2. Review of the record reveals that this applicant suffered a thrombosis of the pontine artery in 1955 which left him with a mild weakness and hypesthesia of the left side of the body and lower right face. As described, these residuals were not of such severity as to render 'him unfit to perform military duty. It is noted that he is being compensated by the VA.
■3. The opinion is expressed that the medical evidence of record reveals that Sergeant Jordan was fit for duty at the time of his separation from the service and there is no evidence of any physical or mental impairment of such a severity as to warrant retirement for disability under the rules, laws, regulations and policies in effect at the time of his separation from the service.
Dr. Snyder’s medical specialization was Administrative Medicine — Urology. His opinion was, however, concurred in by Lieutenant Colonel William J. Tiffany, the Chief Psychiatric and Neurological Consultant to the Surgeon General.
On April 2, 1964, a Correction Board Examiner, by a memorandum to the Board, summarized plaintiff’s request, noted that the VA granted plaintiff “a 60% rating for artery condition and skin condition of the feet,” set forth the Surgeon General’s advisory opinion, and concluded with the following:
RECOMMENDATION: A thorough study of the records, together with the opinion of the SGO fails to reveal evidence of error or injustice in appl’s separation from service not by reason of physical disability with entitlement to retirement pay. It is therefore recommended his application be denied a formal hearing.
Plaintiff was advised, by letter of April 28,1964, from the Adjutant General, that the Correction Board had denied his application.
On December 3,1966, plaintiff’s counsel requested the Correction Board to reconsider his application. Counsel sub *77 mitted a brief to the Correction Board, and a request was made that plaintiff be granted a hearing. By letter of March 30,1967, plaintiff’s counsel advised the Board of plaintiff’s hospitalization from December 2, 1966, to January 10, 1967, and the Board was requested to evaluate the report of such hospitalization in considering plaintiff’s application.
Plaintiff was discharged from Montgomery VA Hospital on March 31, 1967, after yet another period of hospitalization, the Hospital summary stating:
This veteran appears to have some type of a chronic brain syndrome with episodes of exacerbation with involvement of the same area, enhancement of right facial sensory changes and left hemiparesis. This would appear to be on the basis of relative vascular insufficiency rather than additional cerebral vessel thrombosis, although the latter is possible. The condition appears to be much relieved by assuming the recumbent position and enhanced by forcing himself to continue the upright position, particularly if other demands are made on the circulation by musculo skeletal activity. It apparently has been possible for this veteran to work under favorable conditions, but also there has been a recurrence of symptoms of such that he had to discontinue work for a long period of time in 1964 and again in 1966.
The diagnosis with respect to the described condition was “chronic brain syndrome, secondary to old cerebral thrombosis, possibly of right paramedian branches of the basilar artery, with left hemiparesis, right facial paresis and sensory changes, headache and left muscular ache of central origin; * *
On April 20, 1967, the Correction Board requested a further advisory opinion from the Surgeon General’s Office, inviting attention to the brief submitted by plaintiff’s counsel, and to plaintiff’s medical records, including the Montgomery VA Hospital Summary dated January 10,1967.
Prior to May 8, 1967, plaintiff had been employed by the Montgomery VA Hospital as a “Nursing Assistant/Medicine and Surgery.” On that date he was given disability retirement. The official “Beason” for the action was “Unable to *78 perform Duties of Nursing Assistant because of Thrombosis of Cerebral Vessel.”
On May 15, 1967, the Chief Psychiatric and Neurological Consultant, Surgeon General’s Office, by Major Franklin D. Jones, MC, Assistant Psychiatric Consultant, rendered the following Opinion:
The records in the case of Herbert Jordan have been carefully reviewed.
There is no new medical evidence of an unfitting medical condition at the time of the subject’s separation from the service. The opinion of the Office of the Surgeon General of 20 March 1964 is concurred in.
On June 7, 1967, the Surgeon General, by Lieutenant Colonel Charles J. McGee, MC, Physical Standards Division (who was board certified in internal medicine), submitted, by a memorandum entitled “Medical Evaluation,” his advisory opinion to the Correction Board. The opinion reviewed plaintiff’s medical history prior to his discharge in December 1958, and advised of the reaffirmation by the Chief Psychiatry and Neurology Consultant to the Surgeon General of his previous opinion. The review pointed out plaintiff’s satisfactory performance of military duty from the time of his release from Brooke Army Hospital in 1956 to his discharge in 1958; the determination of his military fitness upon evaluation by Walter Keed Army Hospital in May 1958; his evaluation prior to separation at DeWitt Army Hospital, Fort Belvoir, Virginia; and his ineligibility to rc-enlist, not because of his medical condition but because of his failure to meet the required mental qualifications. The memorandum also discussed at length “certain matters covered in” the brief submitted by plaintiff’s counsel, including (a) the effect of AN 40-504, dated June 28, 1955, the applicable regulation at the time of plaintiff’s discharge, upon plaintiff’s entitlement to Army physical disability retirement benefits in view of its requirement of a finding of medical unfitness under Army standards; (b) the nature of Army physical disability benefits as contrasted with those of VA; (c) the responsibility posted by the statute (10 U.S.C. *79 § 1201) in “the Secretary concerned,”— in this case the Secretary of tbe Army — to make the determination of unfitness to satisfactorily perform, by Army standards, military duties of the applicable service branch required of the particular individual concerned; (d) the part played by medical boards in the physical disability processing system; (e) the significance of the reference, on plaintiff’s discharge, to plaintiff’s continued need for medical treatment; (f) the weight to be given the Surgeon General’s opinion based, as it is, only on a review of the records and not on a personal medical examination of the applicant. The memorandum concluded as follows:
The opinion of the Surgeon General of 20 March 1964 is reaffirmed that the applicant’s claim of error or injustice in the medical aspects of his separation in 1958 is not substantiated by the available medical records and that he had no physical or mental impairment of a degree. of severity as would have warranted his separation retirement for disability * * *.
In March 1968, plaintiff, in a rebuttal memorandum to the Surgeon General’s advisory opinion of June 7, 1967, again requested a hearing. By letter of April 1,1968, the Correction Board advised plaintiff’s counsel that his application for reconsideration after thorough review, was denied, and that insufficient evidence had been presented to warrant a hearing.
Thereafter, there was no change in plaintiff’s 60 percent rating for service-connected disabilities found by the VA.
The determination by the Army that plaintiff was fit for duty at the time of his discharge is incompatible and inconsistent with the determination of the Veterans Administration that plaintiff’s condition qualified him for a '60 percent disability rating. Both the Army and the VA determinations were based upon physical examination and upon analysis of the medical history of plaintiff’s condition at the time of discharge, which each agency made only two months apart. Their determinations on their face, are clearly contradictory as to the extent of plaintiff’s disability from permanent residuals of a stroke,
*80 We recognize as valid defendant’s argument that the YA rating was made under standards of evaluation for civilian disability which are different than the Army standards for active military service. Despite this fact, and the voluminous medicad evidence on this point of difference, we are nonetheless unable to reconcile a finding by the Correction Board of fitness for active duty at the time of discharge, notwithstanding the medical history of residuals of a serious stroke, with the VA finding that the same residuals of the same stroke became 60 percent disabling for civilian life only two months later.
One possible way to reconcile the differences would be to conclude that the Army failed or neglected to adequately evaluate plaintiff’s condition prior to discharge, We have already noted that there is no record of an electroencephalogram — a significant neurological test — having been performed at the time of plaintiff’s separation physical, and also that his fitness determination was made by junior medical officers who were not specialists or experts in the field of neurology. By contrast, the YA determinations were based upon a thorough and complete neurological evaluation and upon a report by a physician certified by the American Board of Psychiatry and Neurology and trained in the field of neurology.
We have examined the advisory opinions of the Surgeon General to the Correction Board, the memorandum of the Board Examiner, and the letters of notification to plaintiff that his application, and reconsideration thereof, had been denied. One need not put these documents to a rigorous test of judicial scrutiny in order to conclude that they embody a glaring and conspicuous omission; one need only read them. While the Correction Board and the Surgeon General’s Office had available for their consideration all the records of the VA relative to plaintiff’s medical problems, there is no reference, comment, or discussion in any of the opinions of these agencies, concerning the February 1959 YA evaluation and report finding plaintiff 60 percent disabled from the permanent residuals of a stroke. The Board and the Surgeon Gen *81 eral made no attempt to reconcile the conflicting results and conclusions reached by the Army and by the YA, only two months apart, relative to the degree and extent of plaintiff’s paralysis, motor function, right facial weakness, weakness in the left upper and lower extremities and diminished sensation on the left side of the 'body. The Board and the Surgeon General did not deem it important to explain the contradictions between the determination by the Army of plaintiff’s fitness for duty and plaintiff’s medical condition subsequent to discharge, which is characterized by serious recurrences and exacerbations of his cerebral vascular condition, as documented by the reports of VA evaluation, treatment and hospitalization.
The failure of the Board and the Surgeon General’s Office to provide any discussion of plaintiff’s medical history subsequent to his discharge raises the question as to whether or not these agencies considered the YA reports before them at all, and if so, what weight they attached to them.
We note first of all, of course, that a Correction Board considering a man’s application for correction of his records to show him disabled and entitled to disability retirement at the time of his discharge, may properly consider evidence of his medical history following his separation, as such evidence may be highly pertinent to the Board’s inquiry. Powers v. United States, 176 Ct. Cl. 388 (1966).
In Smith v. United States, 168 Ct. Cl. 545 (1964), we held that decisions of the Correction Board were not based upon substantial evidence because there was no satisfactory indication that they were based upon a balanced consideration of all the evidence available and presented. We there pointed out that, while the Board and Surgeon General had before them the records of the YA relative to applicant’s medical problems, it could not be determined what weight was given to that evidence because the Board’s and Surgeon General’s reports were conclusory in nature and did not discuss the details or specify precisely what items of evidence were considered.
Where the medical issues involved are complex and in considerable dispute, and where the contemporaneous deter- *82 ruinations by the Army and the YA as to a person’s medical condition are inconsistent and contradictory, a disposition of a claim for disability retirement by the Correction Board without a hearing and without an analysis of the evidence in writing is inadequate assurance that due weight was given to all the evidence, even though the opinions may formally recite that they are based upon all of the evidence. We conclude that the Board’s decisions herein were not based upon a balanced consideration of all the evidence available and presented. See Smith, supra. Our conclusion does not merely rest upon inference. Colonel McGee, who rendered the June 1967 Surgeon General’s advisory opinion, upon which the Correction Board apparently rested its decision, testified at trial herein that, although he considered the February 1959 VA report (which served as the basis for plaintiff’s 60 percent disability rating), it was “not of significance as to his fitness for separation or retention at the time of separation,” although “it could be,” and “that it was not felt that this had to be gone into.” Colonel McGee further testified that he was primarily interested in what happened to plaintiff while in the service, and whether he was fit for service at the time of separation, and he stated: “then what happened to him after that, I was not judging whether he became fit or not fit for it, he may very well home had subsequent attacks.” Plaintiff did have subsequent attacks or “exacerbations” of his residual condition after discharge, as established by the YA record.
In Hutter v. United States, 170 Ct. Cl. 517, 522-23, 345 F. 2d 828, 831 (1965), a case similar to the one at bar, the court stated:
* * * While the Veterans Administration’s determinations of the degree of disability are not conclusive upon this court, John Stewart Andrews, Executor et al. v. United States, 163 Ct. Cl. 126, 131-32 (1963), we do believe that the results of the medical examination given by the Veterans Administration only one month after plaintiff’s discharge are entitled to considerable weight in our review of the Correction Board’s action, especially in view of the failure of the Air Force to adequately evaluate plaintiff’s condition of hypertension * * *, [Emphasis supplied].
*83 In that case, the court found that, despite the finding of the Surgeon General that Hutter “was not unfit for further military service” and the refusal by the Board to correct his records, a disability rating of 30 percent given by the VA was “conservative, reasonable and justified.” Accordingly, the court awarded plaintiff 30 percent disability retirement pay.
'In view of all the facts and evidence in the instant case, we believe that the February 1959 VA report, based upon a medical examination and evaluation conducted only two months after plaintiff’s discharge, and determining him to be 60 percent disabled from the permanent residuals of a stroke, is entitled to “considerable weight.” It is evident that the Surgeon General’s Office and the Correction Board not only failed to accord the VA report the “considerable weight” which it deserved, but those agencies failed to give the report any weight whatever.
The Correction Board had before it as evidence all of plaintiff’s Army clinical and medical records, as well as those of the VA subsequent to his discharge. A review of all the evidence before the Board establishes that plaintiff’s 1955 stroke resulted in permanent residuals in the form of right facial paralysis, impairment of motor function, and paralysis and weakness of the left arm and leg, with corresponding sensory abnormalities; that his cerebral vascular accident was deemed, by the Army, to be permanent, with the possibility of recurrence of thrombosis and exacerbation of paralysis; that between 1956 land plaintiff’s separation in December 1958, he was in fact examined and treated no less than seven times (including several periods of hospitalization) for his neurological condition and the residuals of his vascular accident; that the Army’s profile findings showed that plaintiff was not physically fit for general military service but that he met the requirements for limited service with assignment to less strenuous duty; that plaintiff was considered physically qualified to be retained on active duty as a result of his physical examination for separation, and that said fitness determination was made by junior medical officers who were not specialists or experts in the field of neurology; that at the time of plaintiff’s discharge, and as a result of his separation physical, it *84 was recommended by the Army that plaintiff undergo “continued treatment after discharge;” that at the time of his discharge plaintiff was not evaluated by a medical or Physical Evaluation Board; that the YA, only two months after plaintiff’s discharge, as a result of thorough and extensive examination and evaluation (conducted by a physician certified by the American Board of Psychiatry and Neurology and trained in the technical field of neurology), found that plaintiff’s neurological condition qualified him for a 60 percent disability rating; that the determinations of the Army and the VA were, on their face, clearly contradictory as to the extent of plaintiff’s disability from permanent residuals of his stroke; that subsequent to plaintiff’s discharge he has undergone numerous periods of treatment and hospitalization by the YA for recurrences and episodes of exacerbation of his neurological condition; that on March 27,1962 plaintiff was found “chronically ill” and not physically able to do the work of a nursing assistant anywhere near satisfactorily; that on May 8,1967, plaintiff was given disability retirement by the YA because he was “unable to perform duties of a Nursing Assistant because of Thrombosis of Cerebral Yessel;” and that the YA has consistently confirmed plaintiff’s 60 percent disability rating for the residuals of his stroke from the time he applied upon separation from active duty.
On the basis of all the evidence, it must be concluded that plaintiff was unfit for duty by reason of permanent disability from the residuals of a stroke at the time of his discharge from the Army in 1958. The decisions of the Correction Board to the contrary were arbitrary, capricious and not supported by substantial evidence for two reasons.
First, the decisions were not based upon a complete and balanced consideration of all the relevant evidence available and presented. This conclusion is compelled by the Board’s failure to comment upon or discuss in any way the contradictory and inconsistent determinations of the Army and the YA, only two months apart, with respect to plaintiff’s medical condition. See Smith, supra. It is further compelled by the fact that the author of the Surgeon Oeneral’s June 7, 1967, advisory opinion, upon which the Correction Board *85 apparently rested its decision, admitted at trial that the February 1959 VA evaluation of plaintiff’s condition was “not of significance.” The Board failed to give the records and determinations of the VA the “considerable weight” to which, under the facts and circumstances of this case, they were clearly entitled.
Second, a review of all the evidence before the Board— both Army and VA records — establishes that overwhelming evidence compels the conclusion that plaintiff was unfit for duty at the time of his discharge, rendering less than substantial the evidence in support of the Army determination of fitness.
Defendant was unable, at trial herein, to show that the Correction Board’s decisions were supported by substantial evidence. Two physicians, Colonel Charles J. McGee and Colonel Halbert H. Schwamb, testified at trial. Neither had ever examined plaintiff, and each based his opinion upon a review of plaintiff’s military 'and medical records, including the records of the VA.
It was Colonel McGee’s opinion that when plaintiff left the service in December 1958 he had permanent residuals from the cerebral vascular accident he suffered in 1955. He felt nevertheless that they were minor and not of sufficient severity to interfere in any substantial manner with the performance of the duties assignable to one in plaintiff’s military occupational specialty. He concluded that by December 1958 plaintiff had recovered almost completely from the September 195'5 episode, that he was not unfit under the Army standards as set forth in Ait 40-504 for the performance of his military duties, and that he was therefore fit for separation. This conclusion was obviously based upon his admitted failure, or refusal, to consider the February 1959 VA report, and subsequent VA records, as having any significance to the disposition of plaintiff’s claim. The conclusions reached by Colonel McGee, and the Correction Board’s action thereon, we have already concluded herein are not supported by substantial evidence.
Colonel Schwamb, Chief of Neurology at Walter Need Army Hospital and consultant to the Surgeon General, testi *86 fied that it was his opinion that, at the time of plaintiff’s discharge, he was fit for duty, considering the duties he was required to perform. The conviction of Colonel Schwamb’s conclusion-through stated forcefully by him — was somewhat 'brought into doubt by his admission upon cross-examination that if he had been sitting as a member of a Physical Evaluation Board to review plaintiff’s fitness for duty at the time of his discharge, and if he had had the benefit of the February 1959 VA report, then he would have had “serious doubt” as to plaintiff’s fitness.
Dr. Harold Stevens, a distinguished specialist in neurology and encephalography, rendered a report dated October 16, 1970, pertaining to his review of the documentary evidence, including the Army and VA records, the testimony of defendant’s medical witnesses at trial, and the Army regulations. Although Dr. Stevens did not testify at trial, the parties stipulated that his conclusions were to be given the same weight as if he had testified under cross-examination. Dr. Stevens concluded that:
In addition to the weakness and sensory defect on the left side which would impair his function, the underlying disease process would be expected to cause a recurrence. Therefore, at the time of discharge, he would be unfit for duty.
The correctness of Dr. Stevens conclusion as to plaintiff’s disability, and as to the fact that it “could be expected to cause a recurrence,” is confirmed by the records of the VA, which document plaintiff’s medical condition subsequent to his discharge, and establish that he did in fact have serious recurrences and episodes of exacerbation of his neurological condition.
Plaintiff proved at trial herein, once again, that he was unfit for duty at the time of his separation, and that the Correction Board’s decision finding him fit was arbitrary, capricious and not supported by substantial evidence. He is therefore entitled to recover disability retirement pay computed on the basis of the 60 pecent rating determined by the VA, which we find to be reasonable and justified.
*87 FINDINGS OF FACT
Tbe court, having considered the evidence, the report of Trial Judge Saul E. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a citizen of the United States and a resident of the State of Alabama, was born on April 25, 1930, in Montgomery, Alabama.
2. On October 11, 1950, plaintiff underwent an induction physical examination at Maxwell Air Force Base, Alabama, where he was found physically qualified for induction. After having been a student for 1 year at Alabama State College, plaintiff was inducted into the United States Army on January 24, 1951, and served on active duty until December 9, 1952, at which time he was discharged for the purpose of reenlistment. The highest grade attained during this period of service was Private First Class, Quartermaster Corps. A second physical examination given plaintiff on December 5, 1952, found him qualified for separation and reenlistment. On the day following his December 9,1952 discharge, plaintiff reenlisted for 6 years and served thereafter until his separation as a sergeant on December 10,1958. He served a total of 7 years, 10 months and 17 days on active duty.
3. From December 10, 1952, until his separation in 1958, the capacities in which plaintiff served included the following : supply clerk, motor sergeant, heavy vehicle driver, duty foreman, engineer duty foreman, and engineer painter. His Military Occupational Specialties were Supply Handler, Truckmaster, and Duty Foreman. All character and efficiency ratings given to plaintiff during his service period were “excellent.” Plaintiff served in Korea from January 1953 to August 1954.
4. Upon plaintiff’s discharge on December 10,1958, he was ineligible to reenlist because of his failure to meet the mental qualifications then required by the Department of the Army.
5. While plaintiff was stationed at Fort George G. Meade, Maryland, he awoke on the morning of August 31,1955, with stiffness and numbness of the right side of his face and pain *88 in the right side of his head and right neck. In addition, his left leg and arm were weak. The following day, he was admitted to the United States Army Hospital (USAH) at Fort Meade, where he remained until September 7,1955. The medical impression at the time of admission was that plaintiff, who was only 25 years old, had suffered a cerebral vascular accident. Physical examination revealed a right facial paralysis and weakness in the left upper and lower extremities with the left hand grip about 15 percent its normal strength. The reflexes were decreased slightly in the left arm and leg, although they were normal in the right arm and leg. The attending physician’s “Narrative Summary” set forth on the hospital’s Clinical Eecord covering the September 1-7,1955 hospitalization stated, in pertinent part, that:
* * * On neurological examination he has a right facial paralysis and a left arm and left leg nearly total paralysis. There is a substantial loss of sensation over the entire left side and the right face. * * *
and that
In view of the sudden onset and the progressive nature of this trouble, it would seem that this is a progressive lesion in the right hemisphere. We feel that it is the interest of this patient to transfer him to Neurological Service.
6. Plaintiff was transferred to the Walter Reed Army Hospital (WRAH), Washington, D.C., on September 7, 1955. An electrocardiogram (ECO) given on September 12, 1955, was reported as “borderline normal.” Plaintiff’s condition gradually improved. However, his condition was somewhat complicated because, as set forth on his Clinical Record “Narrative Summary” dated December 19, 1955, he was so “apprehensive.” Certain “Sensory findings were discounted,” the physician further stating that “Examination of the motor system revealed the apparent hemiplegic alternans which was complicated by superimposed hysterical paralysis.” On September 22,1955, plaintiff was given an intravenous amytal (a mild sedative drug) interview. According to the Doctor’s Progress Notes, plaintiff’s “left extremities appeared to be *89 functioning witli good strength and coordination, although there appeared to be a slight genuine weakness on the left.” The interview was terminated when he became irrational and unmanageable without restraint and had to 'be further sedated and forcibly restrained. Plaintiff’s condition continued to improve, the Doctor’s Progress Notes indicating, on September 30, 1955, that “Steady improvement continues,” and on October 3, 1955, that plaintiff desired to return to duty, although the doctor still noted abnormalities in his left extremities. By this time, plaintiff gave up the wheel chair he had been using and was walking without support. On October 6,1955, plaintiff was given 30 days convalescent leave. On his return, his condition was, on November 8, 1955, noted as being “very good,” although he still had residuals of a slight right facial paralysis and a slight left hemiparesis, (muscular weakness affecting one side of the body). Plaintiff again indicated a desire to return to duty. On November 10, 1955, plaintiff appeared before a Staff Conference for consideration of return to duty. It was recommended that plaintiff be returned to duty. On November 14-, 1955, plaintiff was discharged to duty[1] with a diagnosis of “Thrombosis of pontine arterial branch due to unknown cause,” incurred in line of duty, and with a 3-2-2-1-1-1 physical profile for 6 months. A physical profile rendered on November 14,1955, stated that plaintiff was unfit for “prolonged marching, standing, exercising, etc.” Pie was to be reevaluated in May 1956. He was ordered to duty to Camp Gordon, Georgia, on December 7, 1955.
7. On January 17, 1956, plaintiff was admitted to the U.S. Army Hospital at Camp Gordon, Georgia, complaining of severe, steady, constant, right occipital headaches which he had developed 5 days earlier. The diagnosis was undetermined but a cerebral aneurysm was considered possible, An electroencephalogram (EEG) taken on January 23, 1956, revealed no abnormality in the waking or sleeping state. Visual field tests revealed tubular vision of the *90 hysterical type (indicating an emotional component to the illness). Plaintiff’s headaches continued periodically while he was in the hospital but, since they ocurred in the occipital region of the head, especially on the right, did not appear to be a vascular type of headache. It was recommended that he be transferred to a neurology treatment center for further evaluation.
8. Plaintiff was transferred to Brooke Army Hospital, Fort Sam Houston, Texas, where he was hospitalized from March 2, 1958 to August 9, 1956. When plaintiff entered Brooke Army Hospital, physical examination indicated that he had a marked weakness of the left leg and left arm, a markedly diminished left ankle jerk and sluggish left abdominal reflexes. His motor system was considered normal on the right but greatly diminished throughout on the left. He showed some difficulty in walking a straight line with his gait favoring the left leg. 'His sensory system was decreased on the left from the neck down. There was a mild weakness of the right facial nerve, a diminished sensation of the right face and diminished hearing on the right. His coordination was fair on the right and was poor on the left. An EEG given on March 7, 1956, was reported as being abnormal in the right temporal area, and indicative of focal brain damage. A civilian consultant in neurology concluded that plaintiff had an organic disease with “intellectual impairment, probably slight.” Plaintiff improved during his stay in the hospital. Military psychological and psychiatric consultants questioned the organic nature of plaintiff’s symptoms or the extent thereof. They found a strong element of passive-resistance and lack of motivation present. The Chief of the Clinical Psychology Section concluded “Organicity cannot be clearly evaluated in this case. Physical factors must be evaluated from other sources. His symptoms, however, do coincide with his personality dynamics and most likely represent either a purely functional reaction or a marked functional elaboration of a minimal to mild degree of physical difficulty.” A neuropsychiatric consultant concluded that “Although it is possible that he had a small pontine arterial occlusion due to sicklemia, the picture as we see it now is al *91 most completely “hysterical.” He felt that “The upper extremity weakness is obviously not real, because there is no spasticity, no reflex abnormality and no contracture” and that “Any number of tests clinically demonstrate the non-organic nature of the weakness.” Upon his release, it was reported that he had brisk and equal deep tendon reflexes, no pathological reflexes and no residual weakness. Nevertheless, at the conclusion of this hospitalization, plaintiff’s condition was diagnosed as: “Thrombosis n.e.c. (not elsewhere classified) , branch of pontine artery, due to undetermined cause” and “Sicklemia trait.” On August 17, 1956, plaintiff’s unit was notified by the Brooke Army Medical Center that he had suffered a cerebral vascular accident which was deemed to be permanent and that he “should not perform duty necessitating flying or working in high altitudes” (because of possibilities of thrombosis and paralysis, secondary to sick-lemia). His physical profile was “2-i-l-l-l-l-permanent.”
9. Plaintiff was next assigned to Fort Myer, Virginia. On November 7, 1956, plaintiff was seen at the United States Army Dispensary, Fort Myer, Virginia, for pain in his knee, at which time it was recommended he be placed on light duty. He was seen again on November 14 and 17, 1956. On February 25, 1957, and April 16, 1957, plaintiff was seen with reference to pain in the left pectoral muscle. On the latter date, he gave a history of pain 'having started 3 days earlier and being present almost constantly. Plaintiff was hospitalized April 16-17, 1957, at Fort Myer, Virginia, for 'an acute myositis of the left pectoral muscle. He was returned to duty with a 2-1-3-1-1-1 physical profile.
10. On May 20, 1957, plaintiff was admitted to the Fort Myer Dispensary for pain in his right leg of 5 days’ duration, and transferred to the U.S. Army Hospital, Fort Belvoir, Virginia. The Dispensary diagnosis was: “Observation, medical, thrombosis or osteomyelitis.” Plaintiff was hospitalized at the Fort Belvoir Hospital from May 20-27,1957. The diagnosis reported was: “Thrombophlebitis-superficial, etiology undetermined (right anterior tibia) LOD: Yes.” On June 12,1957, it was reported plaintiff had pain and swelling on the right shin line. He was returned to duty and it was *92 noted there was to be no marching. On July 20,1957, plaintiff was seen at the Fort Myer Dispensary because of constant pain in the right tempero-occipital area with pain under the right eye.
11. On January 10, 1958, plaintiff was seen at the Fort Myer Dispensary for right temporal facial headaches which he had experienced for 2 days. He was hospitalized at the Dispensary until January 14,1958, when he was released with a diagnosis of “migraine, cause unknown.”
12. On April 20, 1958, plaintiff began an annual physical examination at the Fort Myer Dispensary. In connection therewith, the Dispensary, on April 22, 1958, requested that the Walter Reed Army Hospital Neurology Clinic evaluate and profile plaintiff, citing as a reason his prior cerebrovas-cular accident and the right facial paralysis and left hemi-paresis that had followed it, and the fact that plaintiff still had weakness and was experiencing headaches. Plaintiff was examined as an outpatient at the Neurology Clinic by Captain Leston B. Nay, Jr., a medical officer who acquired his medical degree in 1955 and who was serving in a training status as a neurology resident. On May 19, 1958, a consultation report rendered by Captain Nay stated:
This 28-year-old, Negro male was referred to Neurology Clinic for evaluation and profiling as part of an annual physical examination. This patient was hospitalized on the Neurology Service, WBAH from 8 'Sept, to sometime in Dec. ’55 for a cerebrovascular accident, resulting in right facial paralysis and left hemiparesis, with corresponding sensory abnormalities. His diagnosis appar-arently was a thrombosis of a pontine artery. It was of interest that several weeks after discharge from WRAH in Dec. ’55 the patient was hospitalized for almost a 6-month period at Brooke Army Hospital for evaluation of persistent headaches. Since that time, according to the patient, he has done well although he complains of occasional right frontotemporal headaches occurring particularly during exertion and fatigue. There has been no syncope or dizziness. He states that he has only mild weakness of the right face, now causing a tight sensation, and he notes weakness of the left side of the body only with marching.
*93 Neurological examination at the present time reveals a well developed and well nourished, young Negro male in no apparent distress. He walks with a normal gait, with normal associated movements. There are no abnormal movements present. The head is normocephalic, no intercranial bruits can be heard, and there is no tenderness over the scalp. There is no muscle atrophy either in the upper or lower extremities, and it is my impression that there is no muscle weakness in the upper or lower extremities. There is minimal right (central) facial weakness present. Romberg’s test is well performed. Finger-to-finger, finger-to-nose, and heel-to-knee tests are well performed. The patient is able to walk on his toes without difficulty. Deep tendon reflexes are equally active bilaterally; no pathological reflexes can be elicited. Superficial abdominal and cremasteric reflexes are present and normal. Sensory examination reveals no abnormalties of vibratory or position sense, or stereognosis. There is hypesthesia and hypalgesia over the right side of the body over the dermatomes including the distribution of the 5th cranial nerve and the 2nd, 3rd and portions of the 4th cervical nerve roots. There is hypesthesia and hypalgesia over the left side of the body from the level of the 4th cervical dermatome caudally, including the left upper and lower extremities. The sensory loss in either case is incomplete.
Impression: Residuals of vascular lesion, possibly involving the right tegmental region of the pons.
Recommendations: In view of the mild residuals of the vascular accident that are now present, the patient should have the following profile (from the neurological standpoint): P-2, U-l, H-l, E-l, S-l.
Tire annual physical examination report prepared by the Fort Myer Dispensary noted the cerebral vascular accident and found plaintiff qualified for retention on active duty.
13. Plaintiff was hospitalized at the Fort Myer Dispensary on November 25-28,1958, for frostbite of both feet. This condition had been previously recorded at the 382nd General Plospital in Japan (1953), the 48th Surgical Hospital in Korea (1953), and the Walter Reed Army Hospital (1955).
14. (a) A physical examination for separation was conducted at the Fort Myer Dispensary on December 5,1958. In a form filled out by plaintiff in connection with this exami *94 nation (labelled “Report of Medical History”), he described his health as “poor.” He indicated in part (by checkmarks in appropriate boxes) that he had experienced or was experiencing “swollen or painful joints”; “frequent or severe headache” ; “eye trouble”; “pain or pressure in chest”; “high or low blood pressure”; “paralysis”; and “loss of memory or amnesia.” Plaintiff was examined by Captain Echols A. Hansbarger, Jr., a medical officer who had acquired his degree in 1956. (After his release from service, Captain Hans-barger was certified in 1963, in the field of pathology). Captain Hansbarger noted that plaintiff had a history of a cerebral vascular accident in 1955; that he had a residual right facial paralysis and left hemiparesis; that microscopic hematuria had been noted on several occasions; and that he then complained of headache, left shoulder and left knee pain. It was stated that he needed hospitalization and clearance for discharge from the medical, orthopedic, genitourinary and neuro-psychiatric departments.
(b) Plaintiff was hospitalized at the DeWitt Army Hospital, Fort Belvoir, Virginia, from December 5, 1958 to December 9, 1958 for such examination and clearance for his discharge. Captain Abner I. Ragins, the examining physician, acquired his medical degree in 1954, was licensed in 1955, and commenced his medical service in 1957 (remaining until 1959, and becoming certified in 1963 in internal medicine). His “Clinical Record — Narrative Summary,” covering this hospitalization was rendered on December 19,1958, 9 days subsequent to plaintiff’s discharge from the service on December 10,1958. It stated in part:
History of Present Illness: * * * In 1955 the patient was hospitalized at Walter Reed Army Hospital, Neurology Service, and treated for a cerebral vascular accident which had resulted in a right facial paralysis and a left hemi-paresis with corresponding sensory abnormalities. His diagnosis at that time was a thrombosis of the right pontine artery. Following his discharge from Walter Reed Army Hospital he was again hospitalized for a six month period at Brooke Army Hospital for evaluation of persistent right temporal headaches. No definite diagnosis was given to the patient *95 and he was discharged with no specific treatment. The patient has retained a slight weakness of the right facial muscles and complains of some fatigue on the left side of his body with overexertion. His most recent complaint has been that of swelling of the left knee following prolonged standing. The knee at no time becomes warm or red and subsides promptly with rest. * * * The patient was re-evaluated at the Neurology Clinic at Walter Reed Army Hospital in May 1958 where no particular change in his physical findings were determined and he was given a P-2, L-2 profile for his neurologic deficit.
PHYSICAL EXAMINATION: Physical examination on admission revealed a well-developed, well-nourished, colored male of low average intelligence who was in no acute distress. * * * Neurological examination revealed the following: There was minimal to mild right lower facial muscular weakness and minimal to moderate muscular weakness of the left upper and lower extremity. The deep tendon reflexes were slightly hyperactive on the left. The superficial reflexes were normal and equal. No pathologic reflexes were elicited. There was normal vibratory and position sense and there was minimal hypesthesia of the lower right portion of the face and the left side of the body including left upper and lower extremities. There was no obvious muscle atrophy and the patient walked with a normal gait. No abnormal cerebellar signs were elicited, and the Rom-berg test was negative.
LABORATORY DATA: * * * Electrocardiogram was interpreted as within normal limits.
Course in the Hospital: The patient was asymptomatic on admission and remained so throughout his hospitalization. He underwent various diagnostic studies with normal values returned. Inasmuch as the patient was recently evaluated * * * at Walter Reed Neurology Service for the neurologic symptoms, no drastic change in his profile was contemplated. His findings now are similar * * *. Therefore, it was felt that the patient could be cleared medically for his voluntary separation from the Service. He is qualified for retention on active duty, physically.
DIAGNOSIS: 1) — 3682—Neuropathy, n.e.c., involving in the right 7th nerve, with mild left-sided hemiparesis, *96 secondary to thrombosis of the right pontine artery in 1955. LOD: Yes. (non-disabling).
Disposition: The patient was discharged to duty on 9 December 1958 with no change in his profile and is considered physically qualified to be retained on active duty.
There is no record of an electroencephalogram (EEG) having been performed in connection with, or during, plaintiff’s hospitalization at Fort Belvoir between December 5 and December 9,1958.
(c) Upon his transfer back to the Fort Myer Dispensary on December 9,1958, Captain Hansbarger completed his “¡Report of Medical Examination.” The Clinical Evaluation listed plaintiff’s “abnormalities,” including, with regard to his face, “Right facial hemiparesis,” and with regard to “Neurologic,” “very mild left Hemiparesis, walks with slight limp. Reflexes equal and active. Free range of motion to all joints and extremities.” Captain Hansbarger’s “Summary of Defects and Diagnoses” stated:
Hemiparesis, left, very mild, not disabling, LCD Yes. Migraine, cause undetermined, mild, LOD Yes. History of cerebral vascular accident 1955. Etiology undetermined (sickle cell preparations negative), LOD Yes.
(d) The following notation was placed in block 75, of plaintiff’s discharge record, captioned RECOMMENDATION'S — FURTHER SPECIALIST EXAMINATIONS INDICATED (Specify): “Continued treatment after discharge.”
(e) Prior to plaintiff’s discharge he did not appear before a board of medical officers or a Physical Evaluation Board (PEB) to determine whether he had a physical disability under the provisions of 10 U.S.C. § 1201 et. seq.
15. As plaintiff was not medically cleared for separation by the last day of his term of service, December 9, 1958, he executed an affidavit on December 8, 1958, relative to remaining on active duty beyond the expiration of his term of service for the purpose of continued hospitalization and, if eligible, subsequent separation and retirement for physical disability. On December 9, 1958, the Fort Myer Dispensary *97 reported that plaintiff was not medically cleared for separation and was being held until December 10,1958 so that necessary additional tests and final evaluation by a medical officer could 'be accomplished. On December 10,1958, the Dispensary reported that on December 9, 1958, medical clearance was given for separation by the U.S. Army Hospital at Fort Belvoir. On December 10, 1958, plaintiff was honorably discharged.
16.After his cerebral vascular accident in 1955, plaintiff received the following physical profile ratings:
14 November 1955 Walter Reed 3-2-2-1-1-1
9 August 1956 Brooke 2-1-1 — 1-1—1
17 April 1957 Myer 2-1-3-1-1-1
20 May 1957 Belvoir 2-1-1-1 — 1-1
4 September 1957 Myer 1 — 1—2—1—1—1
16 October 1957 Myer 2-1-2 — 1-1-1
14 January 1958 Myer 2-1-2-1-1-1
21 April 1958 Myer 2 — 1-2-1-1—1
9 May 1958 Myer 2-1-2-1-1-1
5 December 1958 Myer 2-1-2-1-1-1
9 December 1958 Myer 2-1-2-1-1-1
17. On December 31,1958, three weeks after his discharge from the Army, plaintiff applied to the Veterans Administration (VA) for disability compensation.
18. On February 10,1959,2 months after discharge, plaintiff was evaluated by the VA in Montgomery, Alabama. A neurological examination was conducted by Dr. Charles R. Walton, who was certified in 1948 by the American Board of Psychiatry and Neurology in the field of psychiatry. Plaintiff complained about a continuing sharp pain in his left shoidder, a pain in the back of his head “that comes and goes,” and a “bad” left knee, a result of an injury suffered during his service in Korea. He described his hospitalizations following his cerebral vascular accident, his return “to light duty” at Ft. Myer, Virginia after his release from the Brooke General Hospital, San Antonio, Texas in August 1956, and his remaining on duty at Ft. Myer “about 2 years” until his separation. Dr. Walton reported, in part:
NEUROLOGIC: This is a colored male neatly dressed and appearing in fair physical condition. Showed no *98 evidence of a psychosis or gross mental. deterioration, though he is somewhat slow in his thinking and movements. The head is symmetrical. The pupils are approximately equal, regular and react promptly. Ocular movements normal. Discs normal. There is a moderate right lower facial weakness. Tongue protrudes in the mid line. No atrophy. Uvula is in midline. There is a slight speech defect noted particularly in the use of test phrases. Walks and stands on a narrow base. Tends to drag the left foot hemiplegic fashion. Pías difficulty in walking on heels and on toes. Stands well in the Romberg position with eyes open and closed. There is some ataxia on the left in the finger to finger and heel to knee test. Deep reflexes are present and approximately equal, and within normal limits. The abdominal reflexes are diminished on the left. There is moderate to severe weakness in the left upper and lower extremities. No Babinski or ankle clonus. Sensation is diminished on the left half of the body.
DIAGNOSIS: Thrombosis, cerebral, (Pontine) old, with persistent left hemiplegia. Competent for VA Funds.
19. (a) On March 18, 1959, an initial VA rating decision was rendered wherein plaintiff was awarded a 60 percent rating for residuals of thrombosis of the pontine artery under the VA Diagnostic Code (VADC) 8008 and a 10 percent rating for dermatophytosis (a fungus infection) of the feet (VADC 7813), with a combined rating of 60 percent from December 11,1958. The decision stated, in part:
The current examination shows the veteran to limp, sparing the left leg which the neurological examination shows a tendency to drag the left foot in a hemiplegic fashion. * * * There is some ataxia on the left in the finger to finger and heel to knee test; moderate to severe weakness in the left upper and lower extremities, and sensation is diminished on the left half of the body. There is no evidence of psychosis or mental deterioration though the veteran was somewhat slow in thinking and in his movements. * * * The remainder of the examination is essentially negative. The eyes corrected to normal vision.
Service connection is established for the residuals of cerebral vascular accident and dermatitis of the feet. * * * the claimed knee injury is not supported by service records. * * * Frozen feet not shown in service * * *.
*99 (b) By letter dated March 20, 1959, plaintiff was advised by the VA that be bad been awarded a 60 percent disability rating effective December 11,1958. The letter explained that the award 'had been made “for the following service connected conditions: Artery condition incurred during your Korean service and skin condition of foot which was incurred during your peacetime service.” The letter further advised that no service connection was established, and that no disability compensation was being awarded, for a number of other complaints made by plaintiff, including athlete’s foot; left lower quadrant pain; back trouble; swollen right knee; swollen left knee; myositis chest; migraine; bronchitis; thrombo-phlebitis, right leg,” all of which “were not found at the time of your last physical. The available evidence does not show the existence during service of fever and frozen feet.”
20. By letter dated July 31,1959, the YA advised plaintiff he had been determined to have been totally disabled for insurance purposes and entitled to a waiver of premiums on his Nationa] Service Life Insurance.
21. (a) On March 27,1962, plaintiff was examined by the YA at its facility in Montgomery, Alabama, for an evaluation of his disability. At that time, he was employed at the Veterans Administration Hospital in Montgomery as a nursing assistant. The examining physician stated that: “Gross examination and observation of this veteran, one cannot see how he can be a nursing assistant at the VAH. He is not physically able to do the work anywhere near satisfactorily or enough to be worth hiring a man in this situation.” He stated that plaintiff “is chronically ill”; that he “walks with a slight limp of his left leg”; that “there is a loss of ability to wrinkle the forehead on the right side” and that he is “paralyzed partially on the right side of his face”; that he is “not able to draw his lips over the right,” although there was “no marked flattening * * * of the facial contours” and that “he has a normal appearing face” and that the “only time that would note any lack of ability to move the face would be when he is laughing”; that his speech was “a little slow, sluggish and slurred”; that he “elevates the left arm *100 only np to about a 38-40 degree angle, not up to shoulder level”; that he “has good motion of both extremities at the elbows, wrists, and hands, but has no grip with his left hand at all”; that there is “weakness of his left leg in comparison to the right”; that he is “unable to stand on tiptoe with the left leg”; that “on forward bending the patient touches the floor without bending his knees”; that he “squats down well and rises well, but he is weak and has a little trouble with his equilibrium”; that the “left ankle jerk is sluggish”; and that the “right calf muscle is y2 inch larger than the left,” although “both thigh muscles are equal volume.” The “impression” at the end of the medical report was, in part:
Stroke, with the following residuals: (1) Paresis of the right face, mild, (2) Paresis of the left arm with loss of strength and grip but no wasting. (3) 'Paresis of the left leg, mild; able to be ambultory very well without assistance.
(b) As a result of the examination, it was concluded that no change had occurred in plaintiff’s condition since his previous rating.
22. On April 11,1962, the YA determined that the results of the March 27,1962 physical examination did not warrant any change in plaintiff’s disability rating status as deter-termined on March 18, 1959 and, therefore, confirmed the March 18,1959 rating decision. Such confirmation stated:
'Scheduled examination which does not reveal any actual change in severity or conditions nor that any diffierent breakdown would result in a different combination. Improvement not expected.
23. On July 11, 1963, plaintiff, stating that his general health was “poor,” and that he was not employed, full time but did odd jobs, sought a reexamination by the VA on the question of service-connection for a kidney condition. However, the examination and the resulting findings did not show any organic kidney disease in service or following discharge. By a Eating Decision of August 21, 1963, the rating of March 18,1959 was confirmed.
24. On November 14,1963, plaintiff, without counsel, filed an application with the Army Board for Correction of Mili *101 tary Eecords requesting that his records be corrected to show that he was retired because of physical disability. Plaintiff indicated that he desired to appear before the Board in Washington, D.C., if necessary. He also stated that he believed the failure to be retired for physical disability was unjust because (a) he was discharged while a patient in the hospital; (b) at the time of his discharge he had not been examined by a medical board; (c) at such time there had been no change in his condition; and (d) he had been denied the opportunity to re-enlist due to his medical condition. The “evidence” he relied on in support of his application included the kidney condition for which he had been examined by the VA on July 11,1963, stating: “The VA is now processing new evidence of disturbance in this area.”
25. In connection with plaintiff’s application for the correction of his military records, the Adjutant General’s Office, on December 12,1983, requested the Manager, VA Regional Office, Montgomery, Alabama, to furnish plaintiff’s Army clinical and medical records, and/or physical examination, and a VA Statement of Compensation, “including dato originally -filed; summary of initial rating and subsequent changes with diagnosis; code number and percentage of disability; date(s) of physical examination(s).” The VA responded to this request on January 16,1964.
26. On February 6,1964, the Adjutant General’s Office furnished the Correction Board a summary of plaintiff’s application, a listing of “evidence submitted,” an outline of “material evidence of record” (which included a chronological outline of medical entries from July 9,1951 to December 9, 1958) and a “discussion” which stated:
1. All 'available medical records lent VA have been recalled and are attached.
2. VA reports applicant’s original application for disability compensation was received 31 Dec. 58. He was granted a combined rating of 60% from 11 Dec. 58. The disabilities were residuals of thrombosis of pontine artery — 60% and dermatophytosis of feet — 10% & he is currently receiving compensation in the amount of $142.00 monthly.
*102 27. On March 16, 1964, the Correction Board referred plaintiff’s application and all of bis pertinent records to the Surgeon General’s Office (SGO), Physical Standards Division, for a “comprehensive opinion for the guidance of the Board regarding the medical issues raised by applicant.” An opinion as to whether plaintiff should appear before a medical or Physical Evaluation Board for a determination of the issues involved was also requested.
28. On March 20, 1964, Lieutenant Colonel Harold H. Snyder, Physical Standards Division, Surgeon General’s Office, furnished the Correction Board with an advisory opinion which stated, in part:
1. Eecords in the case of the above-named individual have been carefully reviewed in this office and in the offices of the appropriate consultants to the Surgeon General.
2. Beview of the record reveals that this applicant suffered a thrombosis of the pontine artery in 1955 which left him with a mild weakness and hypesthesia of the left side of the body and lower right face. As described, these residuals were not of such severity as to render him unfit to perform military duty. It is noted that he is being compensated by the VA.
3. The opinion is expressed that the medical evidence of record reveals that Sergeant Jordan was fit for duty at the time of his separation from the service and there is no evidence of any physical or mental impairment of such a severity as to warrant retirement for disability under the rules, laws, regulations and policies in effect at the time of his separation from the service.
Dr. Snyder’s medical specialization was Admistrative Medicine-Urology. His opinion was, however, concurred in by Lieutenant Colonel William J. Tiffany, the Chief Psychiatric and Neurological Consultant to the Surgeon General.
29. On April 2, 1964, a Correction Board Examiner, by a memorandum to the Board, summarized plaintiff’s request, noted that the VA granted plaintiff “a 60% rating for artery condition and skin condition of the feet,” set forth the Surgeon General’s advisory opinion, and concluded with the following:
*103 RECOMMENDATION: A thorough, study of the records, together with the opinion of the SGO fails to reveal evidence of error or injustice in appl’s separation from service not by reason of physical disability with entitlement to retirement pay. It is therefore recommended his application be denied a formal hearing.
30. On April 8,1964, the Correction Board denied plaintiff’s application. By letter of April 28, 1964, from the Adjutant General, plaintiff was so advised.
31. Plaintiff was hospitalized at the VA Hospital, Tuskegee, Alabama, from September 2, 1964, to February 10, 1965, complaining of severe headaches. When discharged, the “Hospital Summary” prepared by the attending physician noted that, according to plaintiff, his headaches dated back to the time of his cerebral vascular accident, and that, although the resulting left hemiplegia and right facial paralysis had improved since then, his headaches had not. The neurological findings were that plaintiff “walked with a left hemiparetic gait”; that he demonstrated a very minimal residual right peripheral facial paralysis, which was more severe in the distal portions; that there “was a flaccid paralysis of the left upper extremities,” although “patient was able to flex and extend the fingers”; that there was “spastic paresis of the muscles of the left lower extremity”; and that the “deep tendon reflexes were brisk and no pathological reflexes were noted.” All other tests, including an electrocardiogram, a right cerebral angiogram, and a spinal tap, were within normal limits.
The Summary then stated:
The Neurologist, after reviewing the history, the urological findings, laboratory data and diagnostic workup concluded that this headache was external to the cranium and very likely muscular in origin, perhaps related to anxiety and tension.
The neurologist recommended a trial of meprobamate (a tranquilizing agent used for relief of anxiety and mental tension). When plaintiff was discharged, his condition was noted as “not improved.” The diagnoses reported at the conclusion of his hospitalization were: “Cerebral Vascular Acci *104 dent, remote, due to Thrombosis of the right paramedian branches of the basilar artery,” left hemiplegia and right facial paralysis, both secondary to the cerebral vascular accident, and “Cephalalgia, etiology secondary to” the accident.
32. (a) On April 1, 1965, plaintiff reported to the VA Hospital at Montgomery, Alebama complaining of his left knee and pain in his chest and back, and requested a medical examination for “disability evaluation.” The “Clinical Impression” on his electrocardiographic record was “(VA— Stroke in 1954 and Sept. 1964.)” An electrocardiogram was recorded as “Probably within normal limits.”
(b) On such date plaintiff was also given a regular physical examination as well as a neuropsychiatric examination. The “History” set forth on the Clinical Eecord of the latter examination noted that he “is able to ambulate with a foot-drop brace on his left leg and ankle”; that he “has recently approached VAH, Tuskegee for additional therapy on complaint of headaches and backaches”; that he “now states the headaches are relieved, however, the backaches are still bothersome, apparently due to some scoliosis from imbalance of the muscles aside to the spine.”
The Eecord also stated in pertinent part:
NEUROLOGICAL EXAMINATION: Veteran is well nourished. The right side of his face has lost most of the nasolabial fold. He is unable to pucker his mouth to whistle, the right corner not responding. His eyes close equally but the right eyelid raises passively more easily than the left. His right eye evidently has some increased intraocular pressure by palpation. ITe says that he has sharp pains in that eyeball at times. His palate deviates to the left. On pushing his chin down against resistance it deviates his head markedly to the left and his neck is easily pushed backwards indicating weakness of the right sternocleidmastoid muscle. His tongue deviates to the left on protrusion. In the upper extremity, he is able to raise his arm and hand to the level of his shoulder but not to a higher level. In raising the left shoulder he does this only by deviating his head and spine to the right. He is able to close his hand on the left but has little strength of grasp, little resistance to passive *105 dorsal and ventral flexion of the wrists or flexion or extension of the left elbow. Biceps and tricept tendons reactions are three plus on the left; one plus on the right. However, he is able to do the finger-to-nose test bilaterally. In the lower extrmity there is, in spite of his foot-drop brace, still sufficient drop of the toe that he walks with some rotary swing of the left leg on the hip. He is able to balance depending principally apparently on the right leg and foot for sensation. * * * No clonus in spite of veteran stating that some times there is spontaneous clonus of the left ankle. Sensation for pain is decreased on the right side of the face and neck, on the left side of the upper extremity, trunk and lower extremity.
DIAGNOSIS: Thrombosis, pontine angle, artery, old (inferior cerebellar artery), manifested by paresis of the skeletal muscles of the left upper and lower extremities, trunk and of the right side of face. Parathesia, left, trunk and extremities, right side of neck and face.
33. A VA Eating Decision was made on May 3, 1965, with respect to the examinations made of plaintiff on April 1, 1965. Plaintiff was awarded a 100 percent rating from September 2, 1964, (the date he had entered the Tuskegee VA Hospital) to March 1, 1965 (the last day of the month in which his hospital treatment was terminated). This award was made pursuant to Paragraph 29 of the VA Schedule for Eating Disabilities so providing when a service-connected disability requires hospital treatment in excess of 21 days, or hospital observation at VA expense for a service-connected disability in excess of such period. The combined rating of 60 percent was reinstated effective March 1, 1965. The decision stated that “Finding do not show loss of use of upper or lower extremity and shows no material change in service connected disabilities.” The 60 percent combined rating under Paragraph 8008 of the VA Schedule for “Eesiduals Thrombosis, Pontine Artery” and Paragraph 7813 (10 percent for Dermatophytosis) was restored.
34. By letter dated December 3, 1965, plaintiff, through counsel, requested the Correction Board to reconsider his application. Thereupon, the Board requested and, on March *106 31,1966 and August 10, 1966, received plaintiff’s Army and YA records.
35. On December 2,1966, plaintiff, described as a “nursing aide,” was admitted to the VA Hospital at Montgomery, Alabama. He complained that for the previous five days he had occipital headache and pain in his left chest radiating down the left arm. Plaintiff remained at the hospital for examination and treatment. The day following admission, there was paralysis of the left arm and leg and the right side of the face.
36. By letter dated December 6, 1966, plaintiff’s counsel submitted a brief to the Correction Board in support of plaintiff’s request for reconsideration of his application. In the brief, a request was made that plaintiff be granted a hearing by the Board.
37. During his hospital stay, the treatment plaintiff received included physical therapy. As described in the Hospital Summary of plaintiff’s stay, dated January 10, 1967: “Within a week’s time” [of plaintiff’s paralysis] “voluntary motion began to return to the involved extremities and subsequently there was a fairly rapid response so that within about an additional two weeks time he was ambulating with the aid of his old short leg drop foot brace.” At the time of his discharge from the hospital on January 10, 1967, there was still “moderate weakness in the extremities.” After his blood pressure of 140/105 upon entry in the hospital, daily blood pressure showed fluctuation from normal to 140/100. Plaintiff received medication for this condition and was placed on a low sodium diet. Upon plaintiff’s discharge, it was recommended that plaintiff continue on a low sodium diet, take daily blood pressure medication, and make progressive use, including exercise, of the involved extremities.
38. On March 9, 1967, plaintiff .filed a claim with the VA for a 100 percent disability rating under Paragraph 29 of the VA Schedule for Bating Disabilities, to which he claimed entitlement as a result of his hospitalization from December 2, 1966, to January 10, 1967. By a Bating Decision of March 23,1967, plaintiff was awarded a 100 percent disability rating from December 2, 1966, to February 1, 1967, the 60 *107 percent rating for “Residuals, Thrombosis Pontine Artery,” under Paragraph 8008 of the VA Schedule, being reinstated from February 1, 1967. The Decision stated “No ratable change is shown in the residuals of thrombosis pontine artery.”
39. On March 17,1967, plaintiff, complaining of headache and pain in his chest while upright, was admitted to the VA Hospital at Montgomery, Alabama, for the third time. His Hospital Summary stated, in part, that examination showed plaintiff “acting somewhat stupified, being slow of mental response and action * * *”; that “Neurological examination noteworthy for the slowed down mental reaction of the veteran and diminution of sensation to right touch and pin prick on the right side of the face, decreased tendon reflexes on the right arm and hand, weakness of the right arm and hand, weakness of dorsiflexion of the right foot, mild impairment of sensations of the right side of the body,” but that skull x-rays showed “no localizing signs of intracranial tumor nor of increased intracranial pressure.” Plaintiff received medication during his hospitalization and was allowed to rest as he desired. The Summary stated that during his stay he “improved so remarkably, appeared cheerful and alert, it was thought that he could be discharged maximum hospital benefit.”
40. By letter of March 30,1967, plaintiff’s counsel advised the Correction Board of plaintiff’s hospitalization from December 2, 1966, to January 10, 1967. The Board was requested to evaluate the report of such hospitalization in considering plaintiff’s application.
41. On March 31,1967, plaintiff was discharged from the Montgomery VA Hospital, the Hospital Summary stating:
This veteran appears to have some type of a chronic brain syndrome with episodes of exacerbation with involvement of the same area, enhancement of right facial sensory changes and left hemiparesis. This would appear to be on the basis of relative vascular insufficiency rather than additional cerebral, vessel thrombosis, although the latter is possible. The condition appears to be much relieved by assuming the recumbent position and enhanced by forcing himself to continue the upright posi *108 tion, particularly if other demands are made on the circulation 'by musculoskeletal activity. It apparently has been possible for this veteran to work -under favorable conditions, but also there -has been a recurrence of symptoms of such that he had to discontinue work for a long period of time in 1964 and again in 1966.
The diagnosis with respect to the described condition was “chronic brain syndrome, secondary to old cerebral thrombosis, possibly of right paramedian branches of the basilar artery, with left hemiparesis, right facial paresis and sensory changes, headache and left muscular ache of central origin; * * *.
42. On April 20, 1967, the Correction Board requested a further advisory opinion from the Surgeon General’s Office, inviting attention to the brief submitted by plaintiff’s counsel, and plaintiff’s medical records, including the Montgomery VA Hospital Summary dated January 10,1967.
43. Prior to May 8, 1967, plaintiff had been employed by the Montgomery VA Hospital as a “Nursing Assistant/ Medicine and Surgery.” On that date he was given disability retirement. The official “Season” for the action was “Unable to Perform Duties of Nursing Assistant because of Thrombosis of Cerebral Vessel.”
44. On May 15, 1967, the Chief Psychiatric and Neurological Consultant, Surgeon General’s Office, by Major Franklin D. Jones, MC, Assistant Psychiatric Consultant, rendered the following Consultant’s Opinion:
The records in the case of Herbert Jordan have been carefully reviewed.
There is no new medical evidence of an unfitting medical condition at the time of the subject’s separation from the service. The opinion of the Office of The Surgeon General of 20 March 1964 is concurred in.
45. On June 7, 1967, the Surgeon General, by Lt. Col. Charles J. McGee, MC, Physical Standards Division, (who was board certified in internal medicine) submitted, by a memorandum entitled “Medical Evaluation”, his advisory opinion to the Correction Board. The opinion reviewed plain - tiff’s medical history prior to his discharge in December 1958, *109 and advised of the reaffirmation by the Chief Psychiatry and Neurology Consultant to the Surgeon General of his previous opinion. The review pointed out plaintiff’s satisfactory performance of military duty from the time of his release from Brooke Army Hospital in 1956 to his discharge in 1958; the determination of his military fitness upon evaluation by Walter Need Army Hospital in May 1958; his evaluation prior to separation at DeWitt Army Hospital, Fort Belvoir, Va.; and his ineligibility to reenlist, not because of his medical condition but because of his failure to meet the required mental qualifications. The memorandum also discussed at length “certain matters covered in” the brief submitted by plaintiff’s counsel, including (a) the effect of AB, 40-504, dated June 28,1955, the applicable regulation at the time of plaintiff’s discharge, upon plaintiff’s entitlement to Army physical disability retirement benefits in view of its requirement of a finding of medical unfitness under Army standards ; (b) the nature of Army physical disability benefits as contrasted with those of VA; (c) the responsibility vested by the statute (10 U.S.C. 1201) in “the Secretary concerned”,— in this case the Secretary of the Army — to make the determination of unfitness to satisfactorily perform, by Army standards, military duties of the applicable service branch required of the particular individual concerned; (d) the part played by medical boards in the physical disability processing system; (e) the significance of the reference, on plaintiff’s discharge, to plaintiff’s continued need for medical treatment; (f) the weight to be given to the Surgeon General’s opinion based, as it is, only on a review of the records and not on a personal medical examination of the applicant. The memorandum concluded as follows:
7. The opinion of The Surgeon General of 20 March 1964 is reaffirmed that the applicant’s claim of error or injustice in the medical aspects of his separation in 1958 is not substantiated by the available medical records and that he had no physical or mental impairment of a degree of severity as would have warranted his separation retirement for disability * * *
46. (a) On June 10, 1967, plaintiff again complaining of headache, was, for the fourth time, admitted to the VA *110 Hospital at Montgomery, Alabama. Plaintiff was wearing Ms “foot drop brace.” Examination showed weakness in his left arm and leg and borderline hypertension. The consultant in neurology felt that plaintiff needed further evaluation at a neurological neurosurgical center, with activity restriction and mild sedation. Plaintiff improved during his hospital stay.
(b) On July 5, 1967, plaintiff was transferred to the YA Hospital at Birmingham, Alabama, for evaluation of his right facial and left sided weakness. A neurological examination showed “no facial sensory deficits,” although there was “right peripheral facial weakness.” The examination also showed that “the other cranial nerves appeared to be intact”; that plaintiff’s “gait was abnormal”; and that “no definite atherosclerotic changes were noted”, although his blood pressure was 180/100, indicating hypertension. On July 26,1967, plaintiff was transferred back to the VA Hospital at Montgomery “with diagnosis of old infarction, possibly in bones secondary to small vascular vessels supplying the area.”
(c) Plaintiff was discharged from the YA Hospital at Montgomery on July 28,1967, with a diagnosis of “ (1) Verte-brobasilar artery insufficiency with old pontine infarction and left hemiparesis. (2) Essential vascular hypertension.” This was the same diagnosis that had been made by the YA Hospital at Birmingham. Plaintiff was given medication for his hypertension, the Hospital Summary noting that, with the medication, plaintiff’s condition “showed very little change”; that “no further treatment was thought indicated”; that he “should continue treatment under the care of his private physician or through the YA Regional Office outpatient clinic” ; and that he “will probably not be able to return to productive work.”
47. (a) Plaintiff filed a claim for increased YA benefits because of his recent hospitalization. On August 18, 1967, a YA rating decision was rendered in which it was determined that “No ratable change is shown in the service connected residuals of thrombosis.” Plaintiff was, under Paragraph 29 of the YA Schedule, awarded a 100 percent rating from *111 June 10, 1967, the date be bad entered the YA Hospital at Montgomery, to August 1, 1967, the 60 percent combined rating being reinstated from August 1,1967. On August 23, 1967, the YA advised plaintiff that review of bis claim did not warrant any change in the prior determination. Plaintiff was, however, advised that he could apply for increased benefits based on unemployability.
(b) Plaintiff did file a claim with the YA to establish his unemployability because of service connected disability. On September 14, 1967, a YA rating decision was rendered on plaintiff’s claim in which it was concluded that “Entitlement of individual unemployability is established” from August 1, 1967. Plaintiff was so advised in a letter from the VA dated September 25, 1967. The decision does not indicate, however, the award of any increased benefits over the 60 percent combined rating previously awarded.
48. On March 4, 1968, plaintiff, by his counsel, filed a memorandum in rebuttal to the Surgeon General’s advisory opinion of June 7, 1967. In the memorandum, it was again requested that a hearing be granted.
49. By letter dated April 1, 1968, plaintiff’s counsel was advised by the Correction Board that plaintiff’s application was denied. The letter stated in part:
The records show that Mr. Jordan’s original application for correction of records was carefully considered by the Army Board for Correction of Military Records on 8 April 1964. A thorough review of his application and the material presented by him, together with his Army records, failed to disclose 'any evidence of error or injustice in connection with his discharge by reason of expiration of term of service. The Board determined that insufficient evidence had been presented, or was shown in the records, to warrant the granting of a formal hearing of the case and, as a consequence, his application was denied.
A careful study has been made of the information submitted in support of your request for reconsideration of this case, in conjunction with the evidence of record. Based upon such review, it has been determined that the additional information does not provide a sufficient basis to warrant a change in the previous decision of the Board.
*112 50.On June 28, 1968, a VA rating decision was rendered in connection with the evaluation of plaintiff’s service connected disabilities. It was determined that the evidence of record did not show plaintiff was totally disabled under the VA Schedule nor was it shown that he had lost the use of an extremity. The 60 percent combined rating was continued with his disabilities rated as follows:
50% from 8-1-67 through 5-21-68
8008-8513 20% from 5-22-68
PARESIS, REFT ARM, RESIDUALS OF VERTEBRAL BASILAR ARTERY INSUFFICIENCY, WITH PONTINE ■INFARCTION
8008-8520 20% from 5-22-68
PARESIS, LEFT LOWER EXTREMITY, RESIDUALS OF VERTEBRAL BASILAR ARTERY INSUFFICIENCY, WITH PONTINE INFRACTION
7114 20% from 5-22-68
ARTERIAL INSUFFICIENCY, BILAT.
8008-8207 10% from 5-22-68
RIGHT FACIAL HEMIPARESIS, RESIDUALS OF VERTEBRAL BASILAR ARTERY INSUFFICIENCY WITH PONTINE INFARCTION
8008-8212 10% from 5-22-68
PARESIS, 12TH CRANIAL NERVE, RESIDUALS OF VERTEBRO-BASI-LAR ARTERY INSUFFICENOY WITH PONTINE INFARCTION
7813 10% from 12-11-58
DERMATOPHYTOSIS OF THE FEET
Comb: 60% from 5-22-68
Individual unemployability from 8-1-67
51. Because plaintiff was not evaluated under the provisions of 10 USC 1201 et seq, the Correction Board was the first Army forum which could grant or recommend that plaintiff be retired by reason of physical disability. The petition herein was filed on September 28,1968.
52. Army Regulation (AR) 40-504, dated June 28, 1955, entitled Standards of Fitness and Unfitness For Retention *113 on Active Duty, which, was applicable at the time of plaintiff’s discharge, provided:
“Section I

Preliminary

1. Purpose. These regulations establish standards of fitness and unfitness for retention on duty to secure the maximum efficiency and uniformity in the determination of disabilities which warrant disability separation or retirement or warrant retention in the military service. * * * Each member’s case will be considered on its individual merits, the object being to aid in the determination of whether or not an individual is physically or mentally qualified for further military service.
2. Evaluation of physical disabilities.
‡ ‡ ‡
(b) * * * members may be found qualified for retention on active duty even though they have diseases, injuries, or infirmities which would disqualify them for original appointment or enlistment, provided that such diseases, injuries, or infirmities are—
(1) Of such nature and degree as not to affect adversely the performance of continued duty on any assignment commensurate with the individual’s grade or rating including assignments to positions which may be held by an individual regardless of his basic branch.
(2) Not subject to complications or serious aggravation by reason of continued active duty.”
“Section XVI

Neurological Disorders

*****
90. Encephalopathy. In determining the members fitness for retention on duty, encephalopathy is considered to be a clinical condition in which there is evidence of alteration of brain function in any of its several spheres such as intelligence, judgment, perception, behavior, motor control, sensory function, etc. The mere demonstration of circumscribed brain injury or disease does not of itself establish a clinical diagnosis of encephalopathy. *114 Headache may accompany, but is not a primary symptom of encephalopathy since the brain substance is insensitive. Where post-traumatic symptomatology includes only headache or other subjective disturbances of this kind, a diagnosis other than encephalopathy may be indicated. A member in whom the diagnosis of encephalopathy has been established may be retained if the condition is mild, nonprogressive, and does not interfere with the performance of duties.
53. The Veterans Administration Schedule For Eating Disabilities, authorized by 35 U.S.C. § 355, provides in pertinent part as follows:
■GENERAL POLICY IN EATING
1. Essentials of Evaluative Bating. — This rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations, of the various grades of severity as set forth with due regard to previous determinations for compensation or pension purposes. Generally, it may be said that the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacer-bations, or illnesses, proportionate to the severity of the several grades. * * * A veteran’s disability claim may require reratings * * * over a period of many years. * * * ■Different examiners, at different times, will not describe the same disability in the same language; * * *.
# $ * # ‡
3. Resolution of Reasonable Doubt. — It is the defined ■and consistently applied policy of the Veterans Administration to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. When after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability, such doubt will be resolved in favor of the claimant.
* * * * $
7. Higher of Two Evaluations. — Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability pic *115 ture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned.
*****
10. Functional Impairment. — The basis of disability evaluations is the ability of the body as a whole, or of the psyche, or of a system or organ of the body, according to the general or localized effects of disease or injury, to function under the circumstances of ordinary activity, that is, in daily life including employment. Thus, whether the upper or lower extremities, the back or abdominal wall, the eyes or ears, or the cardiovascular, digestive, or other system, or the mind, are affected, evaluations are based upon the usefulness, or lack of usefulness, of these parts or systems, especially in self-support. This imposes upon the medical examiner the responsibility of furnishing, in addition to the etiological, anatomical, pathological, laboratory, and prognostic data required for ordinary medical classification, full description of the effects of disability upon the person’s ordinary activity. In this connection it will be remembered that a person may be too ill, or weak, or otherwise disabled, to engage in work, although he is up and about and fairly comfortable at home or upon limited activity.
*****
'20. Analogous Ratings. — When an unlisted condition is encountered it will be permissible to rate under a closely related disease or injury in which not only the functions affected, but the anatomical localization and symptoma-tology are closely analogous. Conjectural analogies will be avoided, as will the use of analogous ratings for conditions of doubtful diagnosis, or for those not fully supported by clinical and laboratory findings. Nor will ratings assigned to organic diseases and injuries be assigned by analogy to conditions of functional origin.
❖ * * *
NEUROLOGICAL CONDITIONS AND CONVULSIVE DISORDERS
$ * * * *
[124] Neuralgia, Oranial or Peripheral.
* £ * * *

Organic Diseases of the Central Nervous -System

With the exceptions noted, disability from the following diseases and their residuals may be rated from 10 percent to 100 percent in proportion to the impairment *116 of motor, sensory, or mental function. Consider especially psychotic manifestations, complete or partial loss of use of one or more extremities, speech disturbances, impairment of vision, disturbances of gait, tremors, visceral manifestations, etc., referring to the appropriate section of the schedule. With partial loss of use of one or more extremities from neurological lesions, rate by comparison with the mild, moderate, severe, or complete paralysis of peripheral nerves.
* * * * *
8008 Brain, vessels, thrombosis of * * *
8412 Neuralgia

Diseases of the Peripheral Nerves

The term “incomplete paralysis,” with this and other peripheral nerve injuries, indicates a degree of lost or impaired function substantially less than the type picture for complete paralysis given with each nerve, whether due to varied level of the nerve lesion or to partial regeneration. When the involvement is wholly sensory, the rating should be for the mild, or at most, the moderate degree. The following ratings are for unilateral involvement; when bilateral, combine with application of the bilateral factor.
*****
Bating All raducular groups
Major Minor 8513 Paralysis of
90 80 Complete_
Incomplete
Severe_ © © ©
Moderate_ o CO © rtf
Mild_ © <N © <N
Sciatic nerve
Rating 8520 Paralysis of
Complete; the foot dangles and drops, no active movement possible of muscles below the knee, flexion of knee weakened or (vary rarely) lost. OO o
Incomplete
Severe, with marked muscular atrophy_ © o
Moderately severe_ ^ o
Moderate_ fcO o
Mild_ h-i o

*117
Diseases of the Arteries and Veins

7100 Arteriosclerosis, general
* h= * * *
Note. — Rate the. arteriosclerotic complications, such as renal, cardiac, or cerebral, under the appropriate schedule.
* * sic St *
7114 Arteriosclerosis obliterans
He >¡e s|c sjc *
08 3 ?> 03 «. SM OS 5. £> fa
P 2. o H fo 0 ffi 3
8207 o _g . $ i?a OS J5 ^ O Ah
o © Ph © !> © 0Q ^ © © a § 0 I — í
o g -^=> c3 hi © O d H © © q. g 0 KH
02 o © > '73 r P-1 rf o P4 £<• CO t,. do cl d ® Q l > <§ fci o ¡25.8 go O *¡.3 ©
*
P <! ffi 8 I c3 co ■"3 ffi. c£ s
8212 o CO go <-+. O ffi y,
o d 1 — ' ro © g S
o d > — I ffi © £§ go erh ©
O 02 CO S, S © g-1^ Cl V O d ? P Tj O d
*
54. At the trial herein, two physicians gave expert medical testimony, as follows:
A. Colonel Charles J. McGee
(1) _ 'Colonel 'Charles J. McGee, MC, was called by the plaintiff as an adverse witness. He was then serving as a permanent member of the Physical Evaluation Board at Valley Forge Army General Hospital. He graduated from Boston College in 1931 (receiving a master’s degree in chemistry from the same college in 1932), and from the Harvard Medical School in 1937. From then until 1951, he was associated with various hospitals, undertook further medical studies at universities, and engaged in private practice. He was commissioned 'and has served in the medical corps since 1951, his first assignment being Chief of Medicine at the U.S. Army Hospital at Fort Bragg. In 1950, he was certified as an internist, a field of medicine that relates to diagnosis of internal conditions. Colonel McGee was not a neurologist and was not an expert in the field of neurology. His army duty assignments 'have been Chief of Services or Commanding *118 Officer of various hospitals. He served as Chief of the Retirement and Disposition Qualifications Branch of the Physical Standards Division of the Office of the Surgeon General from 1965 to 1969. The Surgeon General’s opinion to the Correction Board dated June 7,1967, was prepared by Major David E. Sullivan (who was not a doctor) and was reviewed and revised by the witness. Before release, the opinion was also reviewed and approved by the Chief of Psychiatiy and Neurology.
(2) It was Colonel McGee’s opinion that when plaintiff left the service in December 1958 he had permanent residuals from the cerebrovascular accident he suffered in September 1955 (i.e., a thrombosis). He felt nevertheless that they were minor and not of sufficient severity to interfere in any substantial manner with the performance of the duties assignable to one in plaintiff’s military occupational specialty. These residuals consisted of a partial sensory loss in his right facial nerve area, and a slight weakness in his left extremities. Colonel McGee testified that he could not determine from the record whether plaintiff had had more than one cerebrovascular accident during service, although plaintiff gave the appearance of having had others. He concluded, however, that the weight of the evidence was that plaintiff was practically recovered from the 1955 episode by December 1958, and that he was not unfit, under the Army’s standards as set forth in AR 40-504, for the performance' of his military duties, and that he was therefore fit for separation.
(3) Colonel McGee never examined plaintiff. His opinions, as reflected in the Surgeon General’s opinion of June 7, 1967, and as testified to herein, were based upon a review of plaintiff’s military and medical records. Colonel McGee testified that it was standard operating procedure to take into consideration post-discharge history in attempting to advise the ABCMR, and that he did in fact review plaintiff’s examination conducted by the Veterans Administration on February 10,1959. However, he indicated that in rendering the seven page June 1967 SGO advisory opinion there was no discussion of the February 1959 VA examination which was the basis for a 60% rating because it “was not felt that this had to be gone into.” According to Colonel McGee the reason the February 1959 VA examination was not mentioned was because the ABCMR “wanted an answer to [counsel’s] brief;” and the “case [had] already been reviewed *119 and rejected.” It was Ms opinion that the February 10, 1959 YA examination “was not of significance as to [plaintiff’s] fitness for separation or retention at the time of separation.”
B. Colonel Halbert H. Schwamb
(1) Colonel Halbert H. Schwamb, Medical Corps, was produced as a witness by the defendant. He graduated from the University of Nebraska in 1947, received a master of science degree from the University of Colorado Medical Center, and graduated'f rom the University of Nebraska College of Medicine in 1950. After intem-sMps and residencies in neurology tod psychiatry, he served as Chief of Neurology at various hospitals. He was Board certified in neurology in 1959. At the time he testified he was Chief of Neurology at Walter Beed Army Hospital. He has also acted as a consultant to the Surgeon General. He has had extensive service as a member of physical evaluation boards.
(2) Colonel Schwamb too never examined the plaintiff. His opinions were based upon a review of plaintiff’s military and YA records.
(3) Colonel Schwamb’s diagnosis was that plaintiff had encephalopathy, wMch he considered to be a serious condition. He stated that if he had been sitting as a member of a Physical Evaluation Board to review plaintiff’s fitness for duty at the time of Ms discharge, and if he had the benefit of the subsequent (two months later) YA report of Dr. Walton, he would have had serious doubt as to plaintiff’s fitness. It was Colonel Schwamb’s opinion, however, that at the time of plaintiff’s discharge he was, considering the duties he was required to perform, and the pertinent Army regulations, fit for duty. He concluded that the cerebrovascular accident plaintiff suffered in 1955 was in the nature of what is commonly referred to as a slight stroke, and that the residuals thereof were not, as of the discharge date, of such severity as to be unfitting. The witness felt that plaintiff’s continuing to serve as a sergeant in the Quartermaster Corps, in Ms military occupational specialty, would not result in complicating or aggravating his condition. Colonel Schwamb concluded that plaintiff’s situation properly fell within paragraph 90 of AB 40-504 of June 28, 1955, which provides that, where encephalopathy is established, an Army member may be retained if his condition is mild, nonprogressive, and does not interfere with the performance of his duties.
*120 (4) (a) 'It was the witness’ opinion that, at the time of his discharge, the diagnosis of plaintiff’s condition was (as set forth in a formal opinion he rendered on July 11, 1969) :
Encephalopathy, n.e.c. manifested by mild right facial weakness and mild weakness of the left upper and lower extremity, as residuals of an ischemic episode (thrombosis) of the pons of a medial pontine artery area on the right, occurring in Sep 1955, condition stable, * * *.
He further concluded that, were plaintiff to have been rated at such time under the VA Schedule of Eating Disabilities for the disabilities set forth in such diagnosis, such rating would have been 40 percent, as follows:
The ratings would be made under specific categories falling under the blanket Code 8008, headed “'Brain, vessels, thrombosis of * * listed under “Organic Diseases of the Central Nervous System.” The specific dysfunctions thereunder, set forth in his diagnosis, and their ratings, would be (a) with respect to the facial weakness, Code 8207 (paralysis of the 7th (facial) cranial nerve), “incomplete, moderate”, 10 percent; (b) with respect to the weakness of the left arm, Code 8513 (paralysis of all radicular groups), “incomplete, mild, minor”: (i.e. the left side being “minor” in a right-handed person), 20 percent; (c) with respect to the left leg weakness, Code 8520 (paralysis of the sciatic nerve) “incomplete, mild,” 10 percent.
The witness did not feel that the headaches about which plaintiff complained were produced by the thrombosis. While certain types of vascular disease do produce headaches, headache is not normally an accompaniment of the kind of vascular disease that plaintiff has.
(b) The witness felt that the VA erred in giving 10 percent for paresis (weakness) of the 12th cranial nerve (which controls the muscles of the tongue). Since, as shown by the VA report of February 10,1959, plaintiff’s speech trouble was principally with test phrases, the witness concluded that the difficulty was not ratable at all. He further felt that plaintiff’s condition did not warrant the 60 percent “severe” rating that plaintiff received from the VA Under Code 8008.
55. (a) Dr. Harold Stevens of Washington, D.C. made a neurological study and prepared a report based upon his re *121 view of plaintiff’s case. Dr. Stevens is a distinguished specialist in neurology and electroencephalography as noted by the court in Merson v. United States, 185 Ct. Cl. 48, 60 (1968). Dr. Stevens is board certified in both psychiatry and nuerol-ogy. He was Professor of Neurology and Head of the Department of Neurology at the George Washington University (1955-1969). He is presently a Professor of Neurology at The George Washington University. He has served as a consultant to the Walter Reed Army Medical Center (WRAMC), Bethesda Naval Plospital, the VA, National Institute of Health and the Department of Health of the District of Columbia. Dr. Stevens has served as a consultant to these various agencies for approximately 20 to 25 years. Since 1968 Dr. Stevens has served as a consultant in neurology at Andrews Air Force Base Hospital.
(b) As a consultant in neurology to the Army Dr. Stevens has been called upon to render an opinion as to whether an individual is fit or unfit for general military service; and is familiar with with the provisions of Army Regulations (AR) 40-504 dated June 28, 1955 and, particularly, paragraph 90 thereof.
(c) On October 16, 1970, Dr. Stevens rendered a report pertaining to his review of the documentary evidence, the testimony of defendant’s medical witnesses, and AR 40-504, dated June 28,1955. The parties stipulated that if Dr. Stevens were to personally testify in this cause of action his testimony would be as set forth in his report; and that the text of his report is to be accepted by the court as Dr. Stevens’ testimony and may be referred to as such in any findings, report, or opinion rendered by the court in this cause of action. In his report of October 16,1970 Dr. Stevens stated:
* * * I have reviewed the records and pertinent provisions of Army Regulations, 40-504 and particularly paragraph 90, in the case of Herbert Jordan who currently is 40 years of age and who joined the army in January, 1951. He reenlisted for six years in December, 1952 and served on active duty until December 10, 1958, at which time he was separated from the service medically for further duty, according to the army authorities, but, in his opinion, was not suited for military duty *122 ■by virtue of physical incapacity subsequent to a stroke. The V.A. has recognized a service-connected disability for which he is receiving 60% retirement benefits. During his service career, his efficiency and character ratings were excellent and he was promoted to sergeant on July 21,1958. Prior to entering the service, he attended Alabama State College for one year.
T-Tis physical examination on December 5,1952 was negative and he was asymptomatic until May 4, 1953, when he reported to the dispensary because of back pain. This began in 1951 following an injury. Hemorrhagic fever was suspected in January, 1954 and, in February, 1954, he was hospitalized with a diagnosis of old injury of the left knee. In June, it is noted that he suffered swelling of his left knee and also later of his right knee. Chronic pain in the left knee is recorded in September, 1954 and subsequently.
Other than the above, he was well until August 31,1955 when he awakened with pain in the right side of his head and neck and weakness of the right side of the face and of the left leg and arm. He was admitted to the Ft. Meade Army Hospital on September 1, 1955, transferred to Walter Need Hospital on September 7th and remained there until December 7,1955, with a diagnosis of “thrombosis of the pontine arterial branch due to unknown cause.”
Various examinations are recorded in his record and several contradictory observations, opinions and explanations. Some observers inferred that his condition was functional and a diagnosis of conversion reaction was made by one of the examiners. The consensus, however, held that he suffered weakness of the right side of the face and of the left side of the body. The sensory findings varied and at one time it is noted that he had tubular vision. On one occasion, the weakness of the left side resolved under sodium amytal hypnosis. However, it was still concluded by the examining physician that there was an organically determined left hemiplegia. He became maniacal, disoriented and hyperactive as a result of the intravenous sodium amytal, and had amnesia for the entire episode.
According to the Walter Eeed Army Hospital record, he showed improvement early in November, 1955 and was discharged to duty, rehospitalized at Fort Gordon, *123 Georgia on Jannary 17, 1956, and transferred to Brooke Army Hospital on August 9,1956, because of persistent 'headaches. Psychological examination allegedly reflected poor motivation with a hysterical basis for his complaints. His third hospitalization was on May 19, 1958, because of occasional right fronto-temporal headaches associated with exertion and fatigue. During an annual physical examination in May, 1958 he was discovered to have microscopic hematuria and pyuria. Two months after discharge, Mr. Jordan received a neurological evaluation by the Veterans Administration on February 10,1959, by Dr. L. A. Walton. He found moderate right lower facial weakness, a slight speech defect and a tendency to drag the left foot in a hemiplegic fashion. He had difficulty walking on his heels and toes and there was ataxia on the left side with the finger-to-finger and heel-to-heel test. The abdominal reflexes were diminished on the left side and there was moderate to severe weakness in the left upper and lower extremities. Sensation was diminished on the left half of the body. This neurological examination reflects evidence of ‘encephalopathy’ because of motor and sensory impairment rendering him unfit for active duty as outlined in the Army ^Regulations, paragraph 90 of A.R. 40-504.
The neurological examination of April Í, 1965, performed at the Montgomery Alabama Veterans Hospital showed weakness of the right side of the face, the right eyelid raises passively more easily on the left. His palate deviated to the left and on pushing his chin down against resistance, the jaw deviated markedly to the left. His tongue deviates to the left on protrusion. He can raise his left arm to the level of his shoulder but not higher. There is little strength in his grip in the left hand and the biceps and triceps tendon reflexes are increased on the left. There is a left foot-drop and the left knee jerk is hyperactive. No Babinski sign nor clonus. A diagnosis of thrombosis pontine angle artery, old (inferior cerebellar artery) was made manifested by paresis of the skeletal muscles of the left upper and lower extremities, trunk and right side of the face. Paresthesias, left, trunk and extremities, right side of the neck and face.
He was reexamined at the Montgomery, Alabama Veterans Hospital where he was admitted from December 2, 1966 to January 10,1967. He suffered headaches and left chest pain with radiation down the left arm at that time. *124 He wore a drop-foot brace on the left leg and showed moderate weakness on the left. Reference is made to Dr. 'Schwamb’s neurological examination of July 31, 1969. This evidently is the most recent neurological evaluation. The most appropriate diagnoses was considered to be (1) encephalopathy, manifested by mild right facial weakness and mild weakness of the left upper and lower extremity as residuals of an ischemic episode due to thrombosis of a medio-pontine artery on. the right side, occuring in September, 1955 and (2) sickle cell trait without anemia.
Laboratory tests have been negative except for the initial EEG which showed “thalamic epilepsy.”
It appears that most of the examiners directly or circuitously arrived at the opinion that Mr. Jordan did indeed suffer an acute vascular accident, occasionally referred to as “stroke,” which caused his left hemiplegia. If functional elements were present, I would infer that they co-existed with or were superimposed upon an organic lesion which conceivably could have consequently caused an acute anxiety state as a result of the explosive onset of hemiplegia and incapacity. His signs and symptoms fluctuated but, as noted in the Y.A. examination of March 27, 1962, he had “no grip” in his left hand. Reference is made also to the abnormal EEG at Walter Reed Hospital.
Attempts at establishing an etiological diagnosis was not pursued. Regardless of the etiology, it appears that he had intravascular clotting and, in my opinion, implicated a median branch of the basilar artery in the lower third of the pons producing a hemiplegia alterna facialis, that is, intranuclear lesion of the facial nerve on the right with contralateral paralysis of the arm and leg. This caused hemiplegia and is due to involvement of the facial nucleus and at the same time the uncrossed pyramidal fibers which are destined to decussate at a lower level in the medulla. Such a lesion then in the lower third of the pons affects the uncrossed fibers going to the extremities and the crossed fibers to the face. This is a variant of a Millard-Gubler syndrome which sometimes also implicates the sixth nerve nucleus with paralysis of the ipsilateral external rectus.
In addition to the weakness and sensory defect on the left side which would impair his function, the underlying *125 disease process could be expected to cause a recurrence. Therefore, at the time of discharge, he would be unfit for duty.
CONCLUSION 03? LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover disability retirement pay from the date of his separation from active duty, less amounts received from the Veterans Administration, and judgment is entered to that effect.
The amount of recovery will be determined pursuant to Rule 131 of the Rules of this court.
October 4, 1974
ORDER
“This case comes before the court on plaintiff’s motion for the issuance of an order pursuant to the provisions of Pub. L. 92-415 (codified at 28 U.S.C. 1491 (Supp. II, 1972)), directing the correction of plaintiff’s military records in accordance with the court’s decision of July 19,1974. Upon consideration thereof and there being no opposition by defendant,
“it is hereby ordered that as an incident of and collateral to the court’s judgment of July 19, 1974, the Secretary of the Army is hereby directed to correct plaintiff’s military records to show that he was permanently retired from the United States Army on December 10, 1958, by reason of physical disability rated at 60 percent under the Veterans Administration’s Schedule for Rating Disabilities.”
In accordance with the opinion of the court and a memorandum report of the trial judge as to the amount due thereunder, it was ordered on November 15, 1974 that judgment for plaintiff be entered for $104.00.

We are indebted to Trial Judge (now Chief, Trial Division) Saul R. Gamer for his Eindings of Fact which we adopt with some modifications, and for his Opinion, which has been very helpful, and which we use in part, although we reach a different result.

 In reciting tile specialized training prerequisites for certification in the field of psychiatry by the American Board of Psychiatry and Neurology, the Directory of Medical Specialists, Vol. 13 (1968-1969), 13th Edition, page 1348 states: “The training program of a candidate for certification in psychiatry should include sufficient training in neurology to enable him to recognize and evaluate the evidences of organic neurological disease.”

 The parties have stipulated that plaintiff was discharged from the hospital on December 9, 1955, but in view of the hospital’s records in evidence, the stipulation is evidently erroneous.